UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **RUTH A. MITZELL**, | ) | Case No. 5:07 CV 1993 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | (Resolving ECF #28, 29) |
| **ANTHEM LIFE INSURANCE CO.**, et al.,) | | |
| | ) | |
| Defendants. | ) | Magistrate Judge James S. Gallas |
| | ) | |

Pending before the court are the defendants' motion to uphold denial of long term disability benefits and the plaintiff's motion for summary judgment to reverse the denial of benefits .[1]  Ruth Mitzell began work for Anthem Blue Cross and Blue Shield, a subsidiary of WellPoint, Inc., on March 15, 2004.[2]  As an employee of Anthem Blue Cross she was eligible to participate in the WellPoint Flexible Benefit Plan, a group benefit plan, and she enrolled in the Plan's long term disability program. Mitzel's coverage became effective 90 days later on June 13, 2004. The key provision in the Plan's terms excluded any "preexisting condition" that occurred "during the three months prior to your effective date of coverage" [AR 350].

Prior to March 15, 2004,  her start date, Mitzel had consulted with Dr. Arsuaga for complaints of shoulder neck, back, and hip pain with "generalized malaise" lasting several hours

---

[1] Defendants consist of Anthem Life Insurance Co., WellPoint, Inc. and WellPoint Flexible Benefit Plan (the "Plan").

[2]  Defendants state that Mitzel began work at Anthem Blue Cross and Blue Shield  but left employment at Anthem Life. Insurance Co., with no explanation for the discrepancy. Mitzel states only that she began work for "Anthem" which later became Wellpoint, Inc. The parities' inability to come to terms on the matter of Mitzel's employer, though, does not affect the result.

2

despite the use of over-the-counter pain medication.  Blood work revealed positive antinuclear antibodies and his impression on March 2, 2004, was:

> positive antinuclear antibody speckled pattern, young female with arthralgias might suggest the possibility of SLE [systemic lupus erythematosus ] but I would expect to see much more criteria before we could assure the diagnosis.  Other possibilities to consider in the differential diagnoses are rheumatoid arthritis, acute thyroiditis. [AR 138]

Further studies were ordered, but their results were only mildly indicative of SLE. [3] On March 25, 2004, however, Dr. Arsuaga's examination revealed macular erythematosus rash on the forearms, which did suggest the possibility of SLE [AR 139]. Further testing was conducted, and Mitzel's problems continued to be treated as lupus until June 17, 2004.  On that date she was hospitalized and a kidney biopsy taken which indicated Wegener's granulomatosis [AR 130].  This diagnosis followed the June 13, 2004 effective date of long term disability coverage.

Approximately one year later, on June 3, 2005, Mitzel left her employment claiming disability [AR 329].  Mitzel's November 2005 application stated that she became unable to work

---

[3] An indication of the broad range of symptoms for SLE is indicated in the Social Security Administration's *Listing of Impairments* setting out the criteria for awards of disability insurance benefits and supplemental security income:

**Systemic lupus erythematosus** (14.02).

a. General. Systemic lupus erythematosus (SLE) is a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis). Immunologically, there is an array of circulating serum auto-antibodies and pro- and anti-coagulant proteins that may occur in a highly variable pattern.

20 C.F.R. Pt. 404, Subpt. P, App. 1 Sec. 14.00 (D) (2008)

on June 3, 2005, due to Wegener's granulomatosis.[4]  Long term disability benefits were tentatively awarded by WellPoint Flexible Benefit Plan on December 2005 contingent to pre-existing condition review.

As a part of this review, on May 3, 2006, Dr. Steginski, a physician employed by the Plan, opined that Mitzel's medical records disclosed that she had rash, joint aches, positive antibody studies, mouth ulcerations and his impression was systemic lupus erythematosus  and that Wegener's granulomatosis, which can affect the lungs, kidney, upper respiratory tract and sinus and produces positive anti-nuclear antibodies is a closely related condition [AR 113-115, 119].

On May 18, 2006 benefits were terminated with this explanation:

> The plan under which you are covered contains a Pre-Existing Condition Exclusion which states:
> *"Pre-Existing Conditions*
>
> *During your first 12 months of coverage, you will not be eligible to receive disability benefits  if your disability is caused by, contributed to by (sic) or results from a pre-existing condition.*
>
> *A pre-existing condition is a sickness or injury for which you received medical care or services (including doctor visits, prescriptions and diagnostic tests) during the three months prior to your effective date of coverage.*
>
> *This pre-existing condition exclusion also applies to any increase in coverage you elect during an annual enrollment period."*

---

[4] "[A] multisystem disease chiefly affecting males, characterized by necrotizing granulomatous vaculitis involving the upper and lower respiratory tracts, glomerulonephritis, and variable degrees of systemic small vessel vasculitis, which is generally considered to represent an aberrant hypersensitivity reaction to an unknown antigen." *Dorland's Illustrated Medical Dictionary* pg. 717 (28th ed. 1994).

4

The effective date of your coverage under the Group Long Term Disability policy was June 13, 2004.  As your disability commenced on June 3, 2005 it was necessary for us to conduct a pre-existing review on the 3 months prior to your effective date of insurance, or March 15, 2004 through June 13, 2004.

Medical information from Dr. Arsuaga during an office visit on March 2, 2004 indicates the following:  "presents with acute onset of symptoms dating to October 2003 when initially she experienced right shoulder pain followed by right lateral shoulder pain and neck pain, low back pain, left hip pain and generalized malaise lasting several hours despite the use of NSAIDS in the past."  At that time Dr. Arsuaga's impression was" "positive antinuclear antibody speckled pattern, young female with anthralgias (*sic*) might suggest the possibility of SLE but I would expect to see much more criteria before we could assure the diagnosis.  Other possibilities to consider in the differential diagnoses are rheumatoid arthritis, acute thyroiditis.  I will repeat her serologic markers, start Etodolac 500 mg b.i.d., chest-x-ray, urinalysis, CCP, RPR et cetera."

Another visit with Dr. Arsuaga, dated March 25, 2004 states the problem as "positive antinuclear antibody.  The patient is reporting since her initial visit a mildly pruritic rash involving her arms and proximal thighs but not the trunk.  Her positive antinuclear antibody and now recently noted rash involving her arms and thighs makes me consider more  strongly the possibility of SLE.  We will discontinue Etodolac and recommend only her ibuprofen as needed, but if this rash persists it will be biopsied within the next several weeks. She still does not have enough criteria for SLE but the rash does suggest that possibility.  Follow up within one week-two weeks."

An office visit dated April 2, 2004 indicates the following:  "C/O rash still there, faded some but itchy, glands in neck still swell and then swelling does (sic) down,patient advised if swelling of glands persists she will need to see a surgeon, ENT for possible biopsy."

Yet another office visit dated May 6, 2004 indicates:  "positive antinuclear antibody, since we saw the patient last time her rash has disappeared.  Apparently this was pruritic involving her arms and thighs. The rash has disappeared but it was present prior to the use of Etodolac.  Also she has reported now nasal and oral ulcerations and recently increasing stiffness of her hands. The patient's symptoms of arthralgias, mouth ulcerations, rash and positive antinuclear antibody raise the possibility of SLE."

. . .

5

As you were having symptoms of your condition and consulted with Dr. Arsuaga during the pre-existing time frame, your condition qualifies as pre-existing and is excluded from coverage under the plan. [AR 113-115, Initial Claim denial 518/06].

The letter also advised Mitzel of her appeal rights. [AR 113-115, Initial Claim denial 5/18/06].

Mitzel did appeal and the Plan engaged Dr. Bloomfield for another review of the medical record. The Plan again denied benefits on this first appeal explaining on August 23, 2006:

Our decision was based on the medical documentation contained in your claim file, including, treatment notes from Dr. Feyrouz Al-Ashkar, Dr. Rafael Arsuaga and The Cleveland Clinic, as well as all medical information contained in your Short Term Disability claim file, a review done by an independent physician advisor, as well as a complete review of your medical information by an independent physician specialist, Dr. Ronald J. Bloomfield.

As you are aware, the effective date of your coverage for Long Term Disability was June 13, 2004. As your disability commenced on June 3, 2005, it was necessary for us to conduct a pre-existing condition review on the 3 months prior to your effective date of coverage, or March 15, 2004 to June 13, 2004.

As indicated in our letter, dated July 13, 2006, in order to give your appeal every consideration, we referred your file to an Independent Physician for a full review of medical information. this review was completed by Dr. Ronald J. Bloomfield.

According to the review by Dr. Bloomfield, "Ms. Mitzel became symptomatic in October 2003 and had multiple medical visits before, during and after the March 15, 2004 to June 13, 2004 time period. Her condition deteriorated and she was quite ill by June 17 when she was hospitalized and eventually diagnosed with Wegner's (*sic*) granulomatosis. This is a very serious disorder, and is often difficult to diagnose.

In conclusion, Ms. Mitzel became ill in October 2003 with Wegner's (*sic*). She had multiple medical visits prior to, during and after her pre-existing

6

time period.  She was being examined by Dr. Arsuaga in March and May of 2004 for symptoms which were eventually diagnosed as Wegner's (*sic*).  She became symptomatic from Wegner's (*sic*) in October 2003 and was not diagnosed nor treated until June 2004. The failure to make the diagnosis until a few days after her pre-existing time period ended is noted.  However, she was being examined by Dr. Arsuaga for symptoms which were caused by Wegner's (*sic*).

It is my medical opinion that Ruth Mitzel was examined on March 25, 2004 and again on May 6, 2004 by Dr. Arsuaga for Wegner's (*sic*) granulomatosis. The fact that the diagnosis was not confirmed until after she was hospitalized in June 2004 does not change the fact she was in the midst of an evaluation prior to her becoming so ill that she required a lengthy hospitalization."

Based upon the above information, we have upheld the denial of your claim.

[AR 078-3081, Claim Denial Letter 8/23/06]

Mitzel brought a second appeal and submitted additional documents from her treating physicians on September 26, 2006 [AR 047 appeal letter 6/8/06]. Dr. Arsuaga related that between March and May 2004, no abnormality was noted to suggest a diagnosis of Wegener's and at that time Mitzel did not meet criteria for that diagnosis or SLE [AR 49].   Her employer forwarded the claim forms and medical records from her attending physicians for a second independent peer physician review conducted by Dr. Cunningham. Dr. Cunningham was an employee of MES Solutions "Peer Review Division" in Dallas, Texas.  On January 27, 2007 after reviewing all the information provided by DSI Claim Services, Dr. Cunningham responded to the question whether Mitzel had received treatment for a pre-existing condition affirmatively. He determined that Mitzel received treatment for a pre-existing condition during the time frame of March 12, 2004 to June 12, 2004.  His conclusions were as follows:

As noted by the patient's initial consulting rheumatologist, the patient had

documented migratory polyarthralgias, a positive ANA titer and telangiectasias.  This was coupled with a laboratory study that suggested a chronic inflammatory state.  Migratory polyarthralgias and telangiectasias are associated with chronic inflammatory states, not only in Wagner's ((sic)) granulomatosus, but other systemic inflammatory diseases like rheumatoid arthritis.

Although the patient was not diagnosed with Wagner's (*sic*) granulomatosus until June of 2004 by serology, manifestations of the disease were clearly present as early as the patient's first consulting rheumatologist visit on March 2, 2004.  Wagner's (*sic*) granulomatosus is a systemic inflammatory disease that can present either  subacutely, or in this patient's case, over a protracted period of time.  Initially, the  patient had exhibited signs of general malaise and connective tissue involvement.  Subsequently, she developed renal and pulmonary involvement, more typical of Wagner's (*sic*) granulomatosus.  It is clear from her initial rheumatology evaluation dated March 25, 2004 that a systemic poly-inflammatory disease was present.

This being the case, the patient has received treatment for a pre-existing condition, although it was not diagnosed during the time frame of March 12, 2004 to June 12, 2004.

[AR 18-20 Independent Peer Physician Review 1/17/07]

The final review of Mitzel's appeal of denial of disability benefits was issued on February 1, 2007.  The review included re-evaluation of the claim, reconsideration of all the information previously submitted and consideration of additional new information, including medical records from Mitzel's treating physicians.  [AR 008, Claim Denial Letter 2/01/07]   The review noted that the multiple independent peer physician reviews all concluded that Mitzel received treatment for a preexisting condition, stating "[i]n preparation for the second appeal, the medical records including those submitted with the request for a second appeal were sent to a second independent medical reviewer who  reached  the  same  conclusion.  Although  the  final diagnosis was  not made  until 6/17/04, treatment including diagnostic tests was received during

the time frame of 3/15/04 through 6/13/04."  [AR 008, Claim Denial Letter 2/01/07].  Mitzel

followed this final denial with her action against defendants under 29 U.S.C. §1132(a)(1)(B). [5]

Jurisdiction to resolve this dispute exists under §1132(e)(1) and (2).


*Procedure:*

Mitzel has moved for summary judgment, however, "[t]o apply Rule 56 *after* a full factual

hearing has already occurred before an ERISA administrator is pointless."  *Wilkins v. Baptist Health

Care System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (J. Gilman, concurring).  Mitzel's reference to

summary judgment is merely a misnomer since she also like defendants relies on the record before

the Plan fiduciary.   "A primary goal of ERISA was to provide a method for workers and

beneficiaries to resolve disputes over benefits inexpensively and expeditiously. See 1974 U.S. Code

Cong. & Admin. News 4639, 5000. Permitting or requiring district courts to consider evidence from

both parties that was not presented to the plan administrator would seriously impair the achievement

of that goal. If district courts heard evidence not presented to plan administrators, employees and

their beneficiaries would receive less protection than Congress intended."  *Perry v. Simplicity

Engineering, a Div. of Lukens General Industries, Inc.,*  900 F.2d 963, 967 (6th Cir.1990).


*Standard of Review:*

A plan administrator must adhere to the plain meaning of the Plan's language, as it would be

construed by an ordinary person.  See *Shelby County Healthcare Corporation v.  Southern Council*

---

[5] This section provides: "A civil action may be brought — by a participant or beneficiary – to recover benefits
due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future
benefits under the terms of the plan."

*of Industrial Workers Health & Welfare Trust*, 203 F.3d 926 (6th Cir. 2000). "When interpreting ERISA plans, federal courts apply 'general rules' of contract law as part of the federal common law." *Cassidy v. Akzo Nobel Salt, Inc*., 308 F.3d 613, 615 (6th Cir.2002). As such, "courts interpret ERISA plan provisions according to their plain meaning, in an ordinary and popular sense," giving effect to any unambiguous terms. *Id.* at 617-18 (internal quotation marks and citations omitted)." *Smith v. Bayer Corp. Long Term Disability Plan,*  2008 WL 1848773, 17 (6th Cir. 2008).

The degree of scrutiny that the plan administrator's interpretation of the plan receives under either the *de novo* or the "arbitrary and capricious" standard of review is determined by the Plan's language and the degree of discretion granted.  See *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). There is agreement in this matter that the arbitrary and capricious standard of review applies.  The "arbitrary and capricious standard is the least demanding form of judicial review of administrative action."  *Perry v. United Food & Commercial Workers Dist. Unions 405 and 442*, 64 F.3d 238, 242 (6th Cir. 1995) (quoting *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied*, 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990)).  The "arbitrary and capricious standard is the equivalent of an abuse of discretion standard."  *Thompson v. Simon United States Holdings, Inc.*, 956 F.Supp. 1344, 1352 (N.D. Ohio 1997) (citing  *Perez v. Aetna Life Ins. Co.*, 96 F.3d 813, 821 (6th Cir. 1996).  Thus, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  *University Hospitals of Cleveland v. Emerson Elec. Co.,*  202 F.3d 839, 846 -847 (6th Cir.2000) (quoting *Davis*, 887 F.2d at 693 ).

10

This deferential standard of review, though, is tempered by two principles: first, "the 'possible conflict of interest' inherent in this situation 'should be taken into account as a factor in determining whether the . . .decision was arbitrary and capricious.' *Davis*, 887 F.2d at 694; see also *Borda v. Hardy, Lewis, Pollard & Page, P.C.*, 138 F.3d 1062, 1069 (6th Cir.1998)"; and second, "to the extent that the Plan's language is susceptible of more than one interpretation, [the court] will apply the "rule of *contra proferentum*" and construe any ambiguities against . . . the drafting parties. *Perez v. Aetna Life Ins. Co.*, 150 F.3d, 550, 557 n. 7 (6th Cir.1998)." *University Hospitals of Cleveland v Emerson Electric Company*,  202 F.3d at  846 -847. [6]

*Positions of the Parties:*

Mitzel argues that a heightened standard of review applies because of conflict of interest. She relies on the recent restatement of *Firestone*'s fourth principle from *Metropolitan Life Ins. Co. v. Glenn* :

> (4) If "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor in determining whether there is an abuse of discretion.' " *Firestone*, supra, at 115, 109 S.Ct. 948 (quoting Restatement § 187, Comment d; emphasis added; alteration omitted).
>
> *Id.*, -U.S.-*,* 128 S.Ct. 2343, 2348 (2008).

The Plan Administrator was operating under a conflict of interest fulfilling the dual role of

---

[6]  But disagreement on the application of the rule of  *contra proferentum* was expressed in the unpublished decision in *Smiljanich v. General Motors Corp*., 182 Fed.Appx. 480, 486, 2006 WL 1477932, 5 (6th Cir. 2006)("In our view, the rule stated in *Moos* [ *v. Square D Co*., 73 F.3d 39 (6th Cir. 1999)]-a decision that preceded *University Hospitals*-is correct in the light of *Firestone Tire & Rubber Co. v. Bruch*.").

11

administrating the benefit plan by determining eligibility for benefits as well as making payment for the benefits "out of its own pocket."(Mitzel's Supplemental Brief pg.2 , ECF # 37). Mitzel models her argument on *McLeod v. Hartford Life & Acc. Ins. Co.*, 372 F.3d 618 (3rd Cir. 2004)*,* where the Third Circuit spoke of a "heightened " arbitrary and capricious standard of review when there is an apparent conflict of interest and used the "sliding scale approach" for what modifications were to be made (if any) to the level of scrutiny. *Id.*, 372 F.3d at 623. The majority of the Supreme Court in *Metropolitan Life Ins. Co.*, however, found nothing "improper" with the Sixth Circuit's "combination-of factors method" of review. *Id..*, 128 S.Ct. at 2351-51. Mitzel after pointing out this principle does not illuminate the relationship of her case to the factors discussed by the Sixth Circuit. She merely reiterates that Wegener's was not diagnosed until after the exclusionary period and that until June 18, 2004, she was treated for other medical conditions. While medical evidence is one of the factors, there is no showing of procedural irregularities or a Social Security disability determination which were significant in *Glenn v. Metlife*, 461 F.3d 660, 666-671 (6th Cir. 2006).In short, the possible conflict of interest does not appear to require heightened scrutiny.

Mitzel's main point, though, is that the defendants' arbitrarily and capriciously denied her long term disability benefits that she was eligible for under the Plan because all her treating physicians agreed that she was not exhibiting "symptoms" which would lead to a diagnosis of Wegener's granulomatosis until after the exclusionary period. Mitzel urges the court to follow the reasoning from the Third Circuit in the application of the "rule of *contra proferentum*," specifically *McLeod v. Hartford Life & Acc. Ins. Co.*, 372 F.3d 618 (3rd Cir. 2004), which applies the rationale developed in *Lawson ex rel. Lawson v. Fortis Ins. Co.*, 301 F.3d 159 (3rd Cir. 2002). In *Lawson*, the

12

Third Circuit  modeled its approach on the First Circuit's decision in *Hughes v. Boston Mutual Life Ins. Co.*, 26 F.3d 624 (1st Cir. 1994), and found that the  definition of pre-existing condition was ambiguous because the exclusion was applicable to any sickness "for which" medical advice or treatment was recommended or received before the effective date.  *Lawson* held "that the word 'for' 'has an implicit intent requirement' and that 'it is hard to see how a doctor can provide treatment 'for' a condition without knowing what that condition is or that it even exists.'" *McLeod*, 372 F.3d at 625, quoting *Lawson*, 301 F.3d at 165.


Defendants counter that the only issue before the court is whether the decision to deny long term disability benefits was rational in terms of the policy and not whether Mitzel was suffering from

Wegener's granulomatosis or any other ailment. They contend that the court has limited inquiry into only the reasonableness of the Plan Administrator's decision. They point out the Mitzel's claim was reviewed in a multi-step process that included two independent peer physician reviews. Defendants' argument relies heavily on the opinions from the array of doctors they assembled and their concept of "pre-existing condition" from the vantage point of their medical expertise, and not from the wording describing the term "pre-existing condition"in the Plan itself.


Defendants also rely on *LoCoco v Medical Savings Ins. Co.*, 2007 WL 1875773 (S.D. Ohio), which adjudicated a  non-ERISA-governed private disability contract.  This court has the recent guidance of the Sixth Circuit which  affirmed the district court's decision on appeal.  See  *Lococo v. Medical Savings Ins. Co.*, - F.3d -, 2008 WL 2485095 (6th Cir. 2008).

13

*Alternate Definitions of "Pre-existing Condition":*

The court also notes that there are two definitions of pre-existing condition offered by defendants, one from the group policy itself and another from the Plan benefits booklet distributed to the employees [AR 350, 440].  The court rests the decision on the definition in the benefits booklet, which had been quoted in the initial denial letter.  Plan summaries generally trump the language of the plans themselves.  See *Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 850-51 (6th Cir. 2000); *Haus v. Bechtel Jacobs Co., LLC.*, 491 F.3d 557, 564-566 (6th Cir. 2007).  Accordingly, the court rules that the definition of pre-existing condition is restricted to the benefits booklet definition, and  there is no need to scrutinize the alternate definition from the Plan itself.  As stated in the benefits booklet and in the initial denial letter:

> **A pre-existing condition is a sickness or injury for which you received medical care or services (including doctor visits, prescriptions and diagnostic tests) during the three months prior to your effective date of coverage.**

> [AR 350].

*Analysis:*

Remarkably similar plan language to the present case was reviewed in *Cury v. Colonial Life Ins. Co. of America*, 737 F.Supp.  847 (E.D. Pa. 1990). There, as in this case, the plan defined a pre-existing condition as "a sickness or injury for which you receive medical treatment or consultation, had medical care or service(s), had diagnostic test(s) or took prescribed drug(s) or medicine(s) within 90 days prior to your effective date (outline format omitted)."  *Id.*, at 849. The plaintiff,

14

whose complaints had been attributed to spastic parparesis, myasthenia gravis and residual polio, and who later filed a claim for disability due to multiple sclerosis, claimed that multiple sclerosis was not a pre-existing condition because it was not diagnosed until after the effective date. The Court  reasoned that  the contract was not ambiguous because the meanings of the terms were not obscure nor was there a double meaning.  *Id.,* at 853.  The court read the plan as requiring no diagnosis definite or otherwise of a pre-existing condition focusing  on the term "sickness."  The conclusion was "this 'sickness' turned out to be the same sickness for which plaintiff later sought total disability benefits under the policy issued by Colonial. Therefore the exclusion applies to this case so plaintiff is not entitled to disability benefits under the policy."  *Id.* at 856.

However what distinguishes *Cury* from the present case, is that first plaintiff in that case was informed of  the "sickness" of multiple sclerosis when her physician discussed that the symptoms were consistent with multiple sclerosis .  *Id.*, at 855.  Second, that court departed from the plain meaning of the terms of the plan by interjecting a definition of 'sickness' from state case law, which defined the term as "when the disease first becomes manifest or active or when there is a distinct symptom or condition . . . ."  *Id.*, at 854.  This line of reasoning was later criticized in *Lawson.* [7] The point of these decisions from the Third Circuit is the court must begin with construction of the Plan language.

---

[7]  "Although we base our decision on the language of the policy, we note that considering treatment for symptoms of a not-yet-diagnosed condition as equivalent to treatment of the underlying condition ultimately diagnosed might open the door for insurance companies to deny coverage for any condition the symptoms of which were treated during the exclusionary period. "To permit such backward-looking reinterpretation of symptoms to support claims denials would so greatly expand the definition of preexisting condition as to make that term meaningless: any prior symptom not inconsistent with the ultimate diagnosis would provide a basis for denial.(citation omitted)" *Lawson*,  301 F.3d at 166 .

15

*Medical Care or Services during the exclusionary period:*

To begin, the first issue is whether the Plan's decision that Mitzel received medical care or services within three month prior to the effective date of coverage, was an arbitrary and capricious decision. See *Cury,* at 856.[8]    Defendants point out the relevant time frame for pre-existing conditions in Mitzel's situation was March 15, 2004 to June 13, 2004. [See Initial Claim Denial AR 113-115].  The defendants in their initial denial letter refer to March 25, 2004 "office visit" with Dr. Arsuaga, April 2, 2004 "office visit" and May 6, 2006 "office visit."  Defendants relate that Mitzel was seen by Dr. Arsuaga on March 25, 2004 and testing revealed positive anti-nuclear antibody in addition to a rash on Mitzel's arms and thighs leading the doctor to "consider more strongly the possibility of SLE" and note that "if this rash persists it will biopsied within the next several weeks (AR 139).  Defendants next state that Mitzel again visited Dr. Arsuaga on April 2, 2004 and Mitzel challenges this claim.  Mitzel points out that the April 2, 2004 entry is merely an office note by one of Dr. Arsuaga's nurses in response to a phone call from Mitzel which indicated on the same page that her next appointment was scheduled for May 6, 2004 (AR 139).  The undersigned agrees it was abuse of discretion to conclude that there was an office visit on April 2, 2004 and use this for a basis of denial of disability.

---

[8] The "pre-existing condition" clause in issue is more accurately described as a "'recent treatment' exclusion." See *Hughes* v. *Boston Mutual Life Ins. Co.*, 26 F.3d 264, 269 (1st Cir. 1994) Unlike a standard pre-existing condition clause, "it prohibits coverage for any total disability which occurs during a probationary period and is attributable to a condition for which the insured received medical treatment just prior to the probationary period.. . .[T]he recent treatment exclusion is not strictly designed to weed out known insurance risks; it would even permit activity which, if not reported on an application for a policy with a standard pre-existing condition clause, might suggest fraud. *Id.*

16

However, Mitzel does not deny that there was an office visit on May 6, 2004 where Mitzel reported nasal and oral ulceration and increasing stiffness in her hands [AR 140].  Dr. Arsuaga opined at that time that Mitzel's "symptoms of arthralgias, mouth ulcerations, rash and positive anti-nuclear antibody raised the possibility of SLE" [*Id*].  In any event, the record establishes that there were at least two office visits and as defined under the Plan's definition, "medical care or services" included doctor visits and diagnostic tests.  The record supports that medical care or services were provided during the 90-day pre-existing condition window.

*Ambiguity in the description in the Plan:*

The next issue is thornier, and that is whether the decision that the medical care and services received during the three month exclusion period was a for a pre-existing condition, was arbitrary and capricious. The  Plans's administrative decision was not based on whether Dr. Arsuaga *knew or suspected*  that Mitzel suffered from that undiagnosed Wegener's.  The doctor had disclaimed knowledge of Wegener's and claimed that he was investigating SLE. Rather the administrative decision was based on opinions from medical experts that linked Mitzel's symptoms to the undiagnosed disease and concluded that Wegener's was a pre-existing condition without reference to the description in the Plan.

The Third Circuit's analysis on which Mitzel relies is based on whether or not the sickness was "suspected," a point noted in the recent Sixth Circuit decision in *LoCoco v. Medical Savings Ins. Co.*, - F.3d -, 2008 WL 2485095 , 5-6 (6th Cir. 2008).   As explained in *McLeod*:

Seeking medical care for a symptom of a pre-existing condition can only serve as the basis for exclusion from receiving benefits in a situation where there is some intention on the part of the physician or of the patient to treat or uncover the underlying condition which is causing the symptom.

Such a holding does not mean that we require that a "correct" diagnosis be made before the effective date of a policy in order for an insurance company to be able to deny coverage based on a pre-existing condition. In *Lawson*, we explained the difference between a "suspected condition without a confirmatory diagnosis" and "a misdiagnosis or an unsuspected condition manifesting non-specific symptoms." 301 F.3d at 166. Despite numerous consultations with physicians and multiple MRIs which could have potentially revealed the existence of MS before the effective policy date, neither McLeod nor her physicians ever suspected that she was suffering the effects of MS.

*McLeod,* 372 F.3d at 628.

There was nothing in the plan language in *McLeod* about "suspected" injury or sickness. Rather this line of reasoning appears to relate to the wording of the plan in *McLeod* defining pre-exiting condition as "any manifestations, symptoms, findings, or aggravations related to or resulting from such . . . sickness." *Id.*, 372 F.3d at 621.  Likewise, suspicion of a medical condition has been a decisional focal point in other decisions where the concept of manifestation has been interjected into the definition of sickness. See  *Kirk v. Provident Life and Acc. Ins. Co.*  942 F.2d 504, 505 (8th Cir.1991);  *Cury*, 737 F. Supp. at 855-56.  In *Kirk,* as in *Cury*, the court interjected the concept of manifestation into "sickness," explaining, " the weight of authority is that the sickness should be deemed to have had its inception at the time it first manifested itself or became active, or when sufficient symptoms existed to allow a reasonably accurate diagnosis of the case." *Kirk,*  942 F.2d at 505, and see *Cury,* 737 F.Supp. at 854.    Wellpoint's Plan, in contrast, did not address "manifestations" or "symptoms" "related to or resulting from" such sickness,  *McLeod* is not a

18

precise comparator as Mitzel argues because the court had reviewed a much more expansive definition of pre-existing condition than the one confronting Mitzel.

A more expansive description of pre-existing condition also was reviewed in *LoCoco,* so defendants' reliance on that decision is misplaced..  Mr. LoCoco was treated for a respiratory ailment and the "cloud" which appeared on chest x-rays, and originally diagnosed as pneumonia, was later found to be lung cancer after the effective date of the policy. *Id.,* 2008 WL 2485095 , *1-2 (6th Cir. 2008) The term pre-existing condition was defined as "an injury or illness including a pregnancy, for which medical *advice, diagnosis*, care, or treatment including the use of prescription drugs, *was recommended* or received from a licensed health practitioner during the 12 months immediately preceding the effective date of coverage.(emphasis supplied)" *Id.*, at *4. The Plan affecting Mitzel, in contrast,  dealt only with "medical care or services. . .  received."

*LoCoco*, the plaintiff argued that a specific illness must be diagnosed prior to the effective date of coverage in order for it to be a pre-existing condition. The court disagreed and  reasoned, "if receipt of a recommendation to undergo a diagnostic process is sufficient to render a condition 'pre-existing' as the language of the contract in this case states, it cannot be that an actual diagnostic conclusion is required.  Logically, a party does not receive a diagnostic conclusion until after actually undergoing some kind of diagnostic process." *Id.* at *4.  The Sixth Circuit found the contractual language, in  *LoCoco*, "unambiguously contemplates the pre-effective receipt of a recommendation to get a diagnosis." *Id.* at *5. Consequently, *LoCoco* did not address whether treatment "for which" a condition must be specific. *Id.*

19

The language at issue in the Wellpoint Plan does not address manifestation or suspicion of sickness nor should the court take it upon itself to explain undefined terms.  It also did not speak to recommended treatment or diagnosis.  Further, there is nothing in the definition of pre-existing condition relating to "symptoms." The Plan's wording is ambiguous.

Two cases illustrate the underlying ambiguity in the Plan language. Similar plan language was analyzed in *Pitcher v. Principal Mutual Life Ins. Co.*, 93 F.3d 407 (7th Cir. 1996), where the decision focused on the applicant's medical history to justify finding that there was no "'treatment or service'" *for* breast cancer (emphasis in original)." *Id.,* at 412. The Seventh Circuit read the plan language under a subjective standard. The decision turned on the finding that at the time of the applicant's mammogram, "neither she or her physician knew that she was suffering from cancer." *Id*., at 410.  On the other hand, in *University hospitals of Cleveland v. Emerson Electric Co.,* the plans's exclusion of  "illness or injury for which an individual was treated or took prescribed medicine within 3 months prior to coverage . . . ," was adjudicated upon evidence from medical experts. *Id*., at 847-48.  There the applicant was initially treated for anemia, a visit to a hematologist was recommended for a blood test work-up, but deferred until after the plan became effective. Afterward, the applicant was diagnosed following testing at the Cleveland Clinic with myelodysplastic syndrome, " a bone marrow disease in which defective stem cells proliferate to the exclusion of normal cells" producing acute leukemia. *Id.*, at 843. This chronology and the Plan's evaluation of the claim based on medical expertise bears striking similarity to Mitzel's situation. The Sixth Circuit explained applying an objective viewpoint that:

> where the [Employee Benefit Committee]'s decision enjoys the support of two independent medical opinions, it is sufficiently grounded in reason and evidence to satisfy the "least demanding form of judicial review," the arbitrary and capricious standard. *Davis,* 887 F.2d at 693 (internal quotations and citation omitted). Although UHOC's medical expert reached a different conclusion, complete consensus is not required to establish a reasoned basis for an administrative decision.

*University Hospitals of Cleveland*, 202 F.3d at847.

Thus, the illness, although not yet diagnosed at the onset of the effective date was deemed to have been treated. The medical plan in *University Hospitals* did contain other provisions such as excluding "Hospital expenses incurred in connection with a disease or injury for which a covered individual received treatment or services. . ." This language, though did not dictate whether the plan language was viewed from the objective standpoint, and this "in connection with" clause adds nothing to resolve that the applicant or physicians *knew* the applicant suffered from the fatal disorder, if read subjectively. However, there was no consideration of whether the plan's language was ambiguous in *University Hospitals*.


The wording of the Plan can be interpreted either objectively or subjectively. See *Hughe*s, 26 F.3d at 269-70; *Lawson,* 301 F.3d at 163; *McLeod*, 372, F.3d at 625. The point made in *Lawson* is apropos to the situation at hand because the "mere fact that several appellate courts have ruled in favor of a construction-denied coverage, and several others have reached directly contrary conclusions, viewing almost identical policy provisions, itself creates the inescapable conclusion that the provision in issue is susceptible to more than one interpretation." *Lawson.*, 301 F.3d at 167 quoting *Cohen v. Erie Indemnity Co.*, 288 Pa. *supra*, 445, 431 A.2d 596, 599 (1981). As a result, the rule of *contra proferentum* should govern. Wegener's granulomatosis was not " a sickness or

21

injury for which [Mitzel] received medical care or services (including doctor visits, prescriptions and diagnostic tests) during the three months prior to [her] effective date of coverage**.**"

There is certainly no reason to question Dr. Arsuaga.  Kidney biopsy also serves to confirm SLE.  Lupus nephritis, a form of kidney disease may also be present with SLE. [9]  After all, glomerulonephritis is shared by both diseases' range of  symptoms. (See Notes 3, 4, and 9). Objectively, there is firm ground for the medical assessment that Wegener's existed at the time Mitzel was complaining of arthralgia and malaise to Dr. Arsuaga. These were symptoms of the disease present during the exclusionary period. The Plan administrator relied on "symptoms" and "manifestations" [AR 115, 081, 18-20, 008], but the Plan did not describe pre-existing condition with these terms.

The court, though, must focus on the description of pre-existing condition under the Plan. The Plan did not speak of "symptoms," "suspicions," "manifestations," or "recommendations of diagnosis." It spoke only of  "**a** sickness or injury for which you received medical care or services (including doctor visits, prescriptions and diagnostic tests) during the three months prior to your effective date of coverage**.**"  The word "for" "connotes intent" or "the end with reference to which is, acts, serves, or is done." *Lawson*, 301 F.3d at 165, quoting Webster's Dictionary and Black's Law

---

[9] **Lupus nephritis**. Kidney disease (glomerulonephritis) occurring in patients with systemic lupus erythematosus (which see). It is marked by hematuria (blood in urine) and a progressive worsening ending in kidney failure. 3 J.E. Schmidt, *Attorney's Dictionary of Medicine and Word Finder*, pg. L-208 (2007)

Dictionary. The Plan's language can be read to require that the condition be known before the medical care or services including doctor visits can constitute medical care  "for" the "sickness."

Instead, what is significant in this matter is the Plan's limitation on the Plan Administrator's discretion in administrative duties of "interpreting the Plan, prescribing applicable procedure, determining eligibility for and the amount of benefits, and authorizing benefit payments and gathering information necessary for administering the Plan." [AR 371, Summary Plan Description]. The Plan does give the Plan Administrator discretionary interpretive power, but under the preamble that, "[t]he principal duty of the Plan Administrator is to see that the Plan is carried out, in accordance with its terms, for exclusive benefit of persons who are entitled to participate in the Plan.". There is more than the general statutory restriction on duties under 29 U.S.C. §1104(a)(1)'s requirement that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ." [10]  The Plan itself restricts *discretionary* authority, not just performance of duties in the general sense, to "persons who are entitled to participate in the Plan." Mitzel was entitled to participate in the Plan as an employee who elected long term disability

---

[10]  "ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator "discharge [its] duties" in respect to discretionary claims processing "solely in the interests of the participants and beneficiaries" of the plan, § 1104(a)(1); it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators "provide a 'full and fair review' of claim denials," *Firestone*, 489 U.S., at 113, 109 S.Ct. 948 (quoting § 1133(2)); and it supplements marketplace and regulatory controls with judicial review of individual claim denials, see § 1132(a)(1)(B)."

*Metropolitan Life Ins. Co.,* 128 S.Ct. at 2350.

23

coverage. Granted the Plan goes on to read that, "The Plan Administrator has the discretionary authority to interpret the Plan in order to make eligibility and benefit determinations as it may determine in its sole discretion [and] [t]he Plan Administrator also has the discretionary authority to make factual determinations as to whether any individual in entitled to receive any benefits under the Plan." But the "duty" of discretionary plan interpretation is to be "carried out, *in accordance with its terms*, for exclusive benefit of persons who are entitled to participate in the Plan.(emphasis supplied)."  The terms are set out under this duty to implement the discretion authorized within the overriding restriction.

Supplementing the description of pre-existing condition with more expansive  elements of "symptoms" or "manifestations" falls outside the interpretative powers granted under the Plan. According the denial of benefits based on "symptoms" and "manifestations" of Wegener's granulomatosis that preceded the diagnosis of this "sickness" constituted an arbitrary and capricious act. Wegener's granulomatosis was not " a sickness or injury for which [Mitzel] received medical care or services (including doctor visits, prescriptions and diagnostic tests) during the three months prior to [her] effective date of coverage**."**

### CONCLUSION

For the foregoing reasons, defendants' rescission of its tentative award of long term disability benefits to plaintiff was arbitrary and capricious and defendants' motion to uphold denial of benefits

24

is overruled and plaintiff's motion is granted and defendants are ordered to restore plaintiff's benefits under the Plan.

                                                  _____s/James S. Gallas_____

                                                   United States Magistrate Judge

Dated: July 9, 2008